15297

CAROLINA, C. & O. RY. OF SOUTH CAROLINA v. SOUTH CAROLINA TAX COMMISSION

(15 S. E. (2d), 766)

March 4, 1941.

*Mr. James J. McLaughlin,* of Johnson City, Tenn., and *Mr. Jesse W. Boyd,* of Spartanburg, for appellant,

*John M. Daniel,* Attorney General, and *Mr. Claude K. Wingate,* of Columbia, for respondent,

July 17, 1941.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE L. D. LIDE.

The South Carolina Tax Commission on February 1, 1938, assessed against the plaintiff, Carolina, Clinchfield and Ohio Railway of South Carolina, an income tax for each of the years 1932, 1933, 1934, 1935 and 1936, aggregating including interest the sum of $18,268.08. This amount was paid under protest, and in due time the plaintiff commenced this action against the defendant for the recovery thereof. The cause was tried upon an agreed statement of facts, including certain documentary evidence, before Hon. M. M. Mann, presiding Judge, a jury having been waived. Judge Mann handed down his decree dated March 4, 1941, holding that the tax had been properly assessed and collected, and dismissed the complaint.

The cause comes to this Court upon seventeen exceptions which counsel for appellant reduce to nine points in their carefully prepared brief. But we think the three issues stated in the trial Judge's decree are the fundamental questions raised by the appeal, although there are some incidental matters which will also be referred to hereinafter. The three issues as stated in the decree are as follows:

"(1) That plaintiff received no income during the years in question.

"(2) That if plaintiff received, or should have received, the income upon which the tax was assessed, it was entitled to deduct therefrom interest on its bonded indebtedness which it had accrued on its books.

"(3) That the matters in controversy had been adjudicated by an order of the Hon. W. H. Townsend, Presiding Judge of the Fifth Judicial Circuit, dated October 4, 1929, a copy of which is attached to the complaint."

In order that these issues (that is, claims made by plaintiff and denied by defendant) may be understood a statement of the facts of the case, with as much abbreviation as is practicable, will now be made.

Carolina, Clinchfield and Ohio Railway of South Carolina, the plaintiff herein, which will sometimes be referred to hereinafter as the South Carolina corporation, was chartered under the railway laws of this State in 1909, with a capital stock of $12,000.00. This corporation was originally organized for the construction and operation of a line of railroad, 18.09 miles in length, from Spartanburg to the North Carolina State line. And in order to finance the construction of the road this corporation issued its bonds, secured by a first mortgage dated December 1, 1909, executed to the New York Trust Company and Mortimer N. Buckner, as trustees. The amount of the bonds issued was $3,000,-000.00 of 5% bonds, which matured June 1, 1938; but these bonds were later renewed and extended at the same interest rate to December 15, 1952.

This short line of railroad connected with the North Carolina, Tennessee and Virginia line of railroad owned by the Carolina, Clinchfield and Ohio Railway, a railroad corporation under the laws of the State of Virginia, which will hereinafter sometimes be called the Virginia corporation, and its line connected with a short line in Kentucky owned by the Clinchfield Northern Railway of Kentucky, a railroad corporation under the laws of the State of Kentucky, and hereinafter called the Kentucky corporation. The entire line of railroad was known as the Clinchfield system, and the three corporations operated the same until January 1, 1925.

The Virginia corporation, however, acquired the entire capital stock and bond issue of the South Carolina corporation, and also the entire capital stock and bond issue of the Kentucky corporation, and these two corporations became and are completely *subsidiary* to the Virginia corporation as the *parent* corporation. In order to do its necessary financing the Virgina corporation issued its own bonds secured by a mortgage designated as "First and Consolidated Mortgage" to the Equitable Trust Company of New York, as trustees, dated December 15, 1922. This mortgage covers all the tangible property owned by the Virginia corporation,

and also assigns *inter alia* as additional security for its bonds all the capital stock of, and all the bonds issued by the two subsidiary corporations respectively; the capital stock of the South Carolina corporation being described therein as 120 shares, and the bonds being referred to as "$3,000,000.00 principal amount of First Mortgage Bonds dated December 1, 1909."

The three corporations, as lessors, by an indenture of lease dated October 16, 1924, demised and leased the entire line of railway extending from Spartanburg, South Carolina, to Elkhorn City, Kentucky, for the full term of 999 years from and including the 11th day of May, 1923 (subject to the liens of the outstanding mortgages), to Atlantic Coast Line Railroad Company, a Virginia corporation, and Louisville and Nashville Railroad Company, a Kentucky corporation, as lessees.

The provisions of this lease with reference to the payment of rentals, in so far as the same are pertinent here, are that for the period beginning January 1, 1928, and ending December 31, 1937, there should be paid to the "Carolina, Clinchfield and Ohio Railway, *for itself and the other Lessors*" (emphasis added), a rental of $1,000,000.00 per annum; and for the period beginning January 1, 1938, the annual rental was to be $1,250,000.00, also payable as aforesaid.

These payments of rent, as specified in the lease, were fixed at the amounts named expressly for the purpose of enabling the Virginia corporation to pay dividends upon the par value of its capital stock at certain rates as therein stipulated; "and are not intended to be used for any other purpose whatsoever."

In addition to the money rentals the lessees were required in and by the terms of the lease to pay all the installments of interest, as the same should become due and payable, upon the bonds and obligations of the Virginia corporation as listed in the lease, the same including the mortgage indebtedness of the Virginia corporation itself.

And in this connection, it should be stated that in and by the terms of the lease all the right, title and interest of the lessors, or any of them, in and to all stocks, bonds, etc., were assigned to the lessees, it being stipulated that the stock and bonds of the South Carolina corporation are subject to the liens of its mortgage and also of the mortgage of the Virginia corporation. These securities were thus assigned to the lessees for their full protection, but the lease provided that they should not have the right or power to sell or alienate, unless for the purposes of consolidation or merger, the stocks or bonds of the South Carolina corporation or of the Kentucky corporation, which should continue to be the property of the Virginia corporation "subject to this lease." And it was further provided that upon the expiration or other termination of the lease the lessees should return to the lessors all such stocks and bonds as are then in existence, "and, as to such as shall have been sold or shall have been collected upon maturity, the net amount derived therefrom, after satisfying the liens thereon, but without interest, shall upon the termination of this lease, be paid to Carolina, Clinchfield and Ohio Railway," the Virginia corporation.

It will be observed from the foregoing that while the lessees expressly agreed to pay the interest on the primary obligations of the Virginia corporation, nothing is said in the lease *in that connection* with reference to interest on the bonds of the South Carolina corporation which were owned by the Virginia corporation and had been pledged by it as collateral security for its own bonds. The reason for this is quite apparent, for it was obviously not contemplated that in the normal course of events any interest would ever have to be paid on these purely collateral bonds. But in order fully to protect the lessors or any of them against any such contingency, and also perhaps for other additional reasons, it is provided in Article twelfth of the lease as follows: "The Lessees covenant and agree that they will, at their own cost and expense, abide by and keep and perform, according to the true intent thereof, all agreements, covenants, conditions and

obligations contained in any and all bonds, equipment notes or obligations, and other obligations of the Lessors, respectively, and in the several and respective mortgages, deeds of trust, equipment conditional sale or trust agreements, and other agreements securing the same, which are required by the terms thereof to be kept and performed by the respective makers of said bonds, notes, obligations, mortgages, deeds of trust, equipment conditional sale or trust agreements, and other agreements; provided, however, that the only covenant of the Lessees in regard to the PRINCIPAL of any such bonds or obligations (other than equipment trust obligations) shall be that set out and provided by the terms of Article Eighth hereof." We have capitalized the word *principal,* because aside from the general language preceding the use of that word it emphasizes the fact that this covers and includes any interest, the payment of which may be required, on any of the collateral bonds, but of course does not include the principal of such bonds; and the liability of the lessees with reference to the principal is set out in Article eighth, and is to the effect that the lessors shall before the maturity of any of the bonds execute and deliver to the lessees new bonds "of the proper Lessor Company in an amount sufficient to reimburse the Lessees at fair and reasonable market prices," for all payments, costs and expenditures, in taking up, paying and discharging the maturing bonds. Many other details in connection with this matter are set forth in Article eighth, but they are not material here.

On January 1, 1925, the lessees took charge of the three lines of connecting railroad under the lease, and on and since that date the same have been operated exclusively by the lessees; and the plaintiff, the South Carolina corporation, has carried on no business of any kind within South Carolina or elsewhere; and the plaintiff owns no property whatever, except its 18.09 miles of railroad.

The set-up outlined above seems to be in accordance with sound business practice, one of its purposes evidently being to maintain the corporate existence of the several corpora-

tions in order to comply with the laws of the different states, whereas perhaps otherwise there would have been a merger or consolidation effected.

It appears from the agreed statement of facts that the South Carolina corporation made its income tax return to the South Carolina Tax Commission from year to year "as an ordinary business corporation of South Carolina—not as a railroad corporation," under the provisions of Section 2440(a), Code 1932, and these returns showed no income, but on the contrary showed a large deductible amount on account of interest accrued on its mortgage bonds and certain notes. (It seems that in addition to the mortgage bonds there were certain notes of the South Carolina corporation also owned by the Virginia corporation, and having substantially the same status as the bonds, so far as this case is concerned.) The lessees, however, made their returns as railroad operators in their trade name of Clinchfield Railroad Company, under the provisions of Section 2440(b), Code 1932, and duly paid their own income tax pursuant thereto.

The Tax Commission subsequently determined that upon a proper allocation of its share of the rent paid by the lessees, based upon the mileage of the railroad line in South Carolina, to wit, $58,500.00 per annum, the South Carolina corporation was due for each of the years in question here income taxes amounting in the aggregate, including interest, to $18,268.08, and that no deduction should be made on account of the alleged interest on its mortgage bonds or its notes.

This unavoidably long statement of what we believe to be the material facts involved brings us to the consideration of the three issues above quoted, the first of them being: "That plaintiff received no income during the years in question."

But we think it is quite clear that the South Carolina corporation did in legal effect receive its share of rentals (and the particular method of allocation adopted by the commission does not seem to be questioned).

If the corporate existence is to be maintained, then the rights and responsibilities of the corporation cannot be ignored. It is admittedly true that the rental actually goes as dividends, to the stockholders of the Virginia corporation, which is the parent corporation. But these stockholders could not receive these dividends were it not for the fact that the parent corporation owns all the capital stock and all the bonds of its subsidiary, the South Carolina corporation, which presupposes a proper allocation of its share of the rentals to that corporation. The advantages of the corporate fiction are necessarily subject to the liabilities consequent thereon. However, the taxes assessed against the South Carolina corporation do not reduce these dividends, for the lease contains the following very significant provisions in Article second thereof, to wit:

"During the term hereof, the Lessees shall pay and discharge, at their own cost and expense, when and as the same become due and payable:

*     *     *

"All taxes, assessments and Governmental ·charges imposed, assessed or levied upon the Lessors, or any of them, and upon their respective franchises or interests in and under this Indenture, *and upon the income, or any part thereof, received by the Lessors, or any of them, hereunder.*" (Emphasis added.)

Notwithstanding the suggestion made by counsel for the appellant, we think the action of the Tax Commission can hardly be construed as an attempt to break down the corporate entity of the plaintiff, for it is apparently just the contrary. But the fact that the plaintiff is in truth "owned" and controlled by the parent corporation surely does not relieve it from income taxes justly due the State of South Carolina.

It is quite true, as argued by counsel for the appellant, that it cannot be said that the set-up was created for the purpose of avoiding the payment of income taxes to the State of South Carolina, nor is there any charge of bad

faith. Indeed,' in 1925 our income tax laws were not in existence. However, it is also true that a corporation may not escape its liabilities for income tax merely because it is subsidiary to a parent corporation of another state, which is hence the ultimate beneficiary of its income.

The appellant cites the recent case of *Phillips v. South Carolina Tax Commission*, 195 S. C., 472, 12 S. E. (2d), 13, but we are of opinion that that case, in so far as it is relevant here, tends to support the decree of the trial Judge rather than otherwise. There, an individual domiciled in Virginia was exonerated from paying income taxes to South Carolina arising from property held by him in Virginia or in any state other than South Carolina; but it will be remembered that he was admittedly liable for, and had paid to South Carolina, his taxes on the income received by him from South Carolina property. And so here, the plaintiff should be held liable for the income received by it in legal effect on its property, all of which is in South Carolina. In other words, there is no double taxation involved. But if the plaintiff is absolved from this liability, the State would not only lose the taxes to which it is entitled but the plaintiff would be given a discriminatory exemption.

In the *Phillips case* reference is made to the well-established rule that any substantial doubt should be resolved against the government in favor of the taxpayer. But after due consideration we find no substantial doubt upon the issue now under consideration.

The second issue is as follows: "That if plaintiff received, or should have received, the income upon which the tax was assessed, it was entitled to deduct therefrom interest on its bonded indebtedness which it had accrued on its books."

We think this issue must be resolved in favor of the respondent upon the facts as above recited by us. It is quite clear, as we have already suggested, that it was not contemplated as between the parties to the lease that any interest should ever be paid by the South Carolina corporation on its mortgage bonds or notes, although, of course, they were col-

lectible obligations as collateral security to the bond issue of the parent corporation, and under the terms of the lease the lessees were liable in addition to the cash rental to make any interest payment which might under any contingency be required. And in Article twenty-fifth of the lease the lessees agreed that the obligation to pay the money rental, "the interest upon the securities outstanding and to be issued by the Lessors," and all other sums of money required to be paid by the lessees under the terms of the lease, should be joint and several.

In this connection, it may be noted that the annual allocation of rental to the South Carolina corporation is only a little more than one-third of the interest on the amount of the bonds. The only fair and reasonable conclusion, we think, that can be drawn from the documents in evidence is that the South Carolina corporation is entitled to its allotment of rental as its net income, and whatever obligation there was by way of interest devolved upon the lessees, and hence that the tax was properly assessed and collected. In other words, we think this is actual *net income* within the meaning of the statute; and that the tax thereon was due and payable under the principles laid down in the case of *Crescent Mfg. Co. v. South Carolina Tax Commission,* 129 S. C., 480, 124 S. E., 761.

The third issue is as follows: "That the matters in controversy had been adjudicated by an order of the Hon. W. H. Townsend, presiding Judge of the Fifth Judicial Circuit, dated October 4, 1929, a copy of which is attached to the complaint."

It appears from the statement contained in the Transcript of Record that in 1929 the Tax Commission made an assessment of income taxes for the years 1925, 1926, 1927 and 1928, against the plaintiff, and that these taxes were paid under protest and an action brought for recovery, and that this action resulted in a consent decree whereby the Tax Commission conceded that the taxes for those years had been improperly assessed. This decree

was handed down by Hon. W. H. Townsend, presiding Judge of the Fifth Judicial Circuit, and was dated October 4, 1929. But this decree is clearly not pertinent or binding here, for the law as declared by Judge Townsend was based upon the statutes as they existed prior to the year 1930 under which corporations were taxable only with respect to carrying on or doing business in South Carolina, and it is admitted that the plaintiff was not carrying on or doing business in this State. But as stated by Judge Mann in his decree, the General Assembly in 1930 amended the law by providing that every corporation should pay an income tax on the entire net income of such corporation, "regardless of whether or not that corporation was engaged in business in South Carolina—this, of course, from net income derived from property located in South Carolina." The law as enacted in 1930, Section 2440(a), Code 1932, remains in full force and effect and is applicable to the years involved in the instant case.

Reference should perhaps also be made to the contention of the appellant that the Tax Commission accepted and approved the returns for the years 1932 to 1936, both inclusive, when they were made, and that this constituted a precedent which should be recognized by the Court. It has often been held that "the construction given a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons." *Hadden v. South Carolina Tax Commission*, 183 S. C., 38, 190 S. E., 249, 253; *Carolina Music Co. v. Query*, 192 S. C., 308, 6 S. E. (2d), 473. But we do not think this principle is applicable here, where there is practically no evidence of any construction having been placed on the law by the Tax Commission, unless it be inferred from the mere fact that it did not seek to enforce collection until a considerable time after the taxes had accrued. And the doctrine giving effect to executive construction is usually and properly restricted to cases in which the meaning of the statute is really doubtful. Furthermore, mere non-action on the part of executive of-

ficers will not be treated as executive construction of the tax law. 59 C. J., 1030-1033.

One of the exceptions of the appellant charges the trial Court with error in excluding evidence of returns by, and payment of income tax assessed against, the lessees themselves, but it seems to us that this was clearly irrelevant, because the tax paid by them was under Section 2440(b), Code 1932, and was based on "net operating income," and was of course the net operating income of the lessees.

Counsel for appellant also charge that the trial Judge in his decree was apparently under a misapprehension as to the relationship of the bonds of the parent corporation with those of its subsidiary, the plaintiff, and specifically that he erroneously states that "the purpose of plaintiff issuing and having outstanding these bonds * * * was to permit the parent corporation to issue its consolidated mortgage bonds covering the entire line of railroad." However, it occurs to us that this criticism is rather hypertechnical. It is, of course, true that the mortgage given by the Virginia corporation only conveys by way of mortgage so much of the railroad line as was actually owned by it, but by hypothecating as collateral the mortgages of its subsidiaries, its own bondholders were thus secured *pro tanto* by liens covering the other parts of the entire line.

All the exceptions are overruled, and the judgment of the Circuit Court is affirmed.

Mr. Chief Justice Bonham and Messrs. Justices Baker, Fishburne and Stukes concur.